IN THE DISTRICT COURT OF THE UNITED STATES
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>AMIR GOLESTAN,<br>MICFO, LLC | Crim. No. 2:19-CR-00441-RMG |

### GOVERNMENT'S SENTENCING MEMORANDUM AND MOTION FOR AN UPWARD VARIANCE

On November 16, 2021, the Defendants Amir Golestan (Golestan) and Micfo, LLC (Micfo) (collectively, Defendants) pled guilty to twenty counts of wire fraud after 1.5 days of trial. The United States submits this memorandum in advance of Defendants' sentencing.[1] In his scheme to defraud, Golestan created fake companies and fake persons to obtain the rights to IP addresses he would not have otherwise been entitled to. Golestan did this because he knew he could make money off the fraudulently obtained IP addresses. In fact, Golestan profited nearly $3.3 million from the sale of fraudulently obtained IP addresses and had a contract for over $6 million in place at the time his fraud was discovered. As will be discussed in detail throughout this memorandum, Golestan's conduct merits a serious punishment more than the advisory guideline range set forth by the United States Probation Office (USPO) in its Presentence Report (PSR).

---

[1] The Government's sentencing memorandum and motion for an upward variance pertain primarily to the individual Defendant, Amir Golestan. While the Government did submit objections to Micfo's PSR that were based on the same arguments as the objections to Golestan's PSR, and, if granted, would increase the fine amount, the Government recognizes the USPO found that Micfo does not have the ability to pay a fine. *See* Micfo PSR ¶ 44.

The USPO in its PSR for Golestan determined the total offense level is 14, which results in a guideline range of 15 to 21 months. As will be discussed in more detail below, the Government believes an enhancement in light of the loss amount is appropriate and, as such, the PSR should have increased the base offense level pursuant to § 2B1.1(b)(1). Should the Court agree with the Government, Golestan's advisory guideline range would be higher based on a loss enhancement. However, should the Court overrule the Government's objections and determine the advisory guideline range is appropriately calculated by the USPO, the Government believes an upward variance to a sentence above the advisory guideline range is appropriate after weighing the 18 U.S.C. § 3553(a) factors.

I.  **FACTUAL AND PROCEDURAL BACKGROUND.**

    A.  **Internet Protocol addresses, ARIN policy for assignment or transfer of IP Addresses, and the secondary market for IPv4 addresses.**

An Internet Protocol (IP) address is a numerical label assigned to each device connected to a computer network that uses the IP, or the Internet, for communication. IP addresses serve two basic functions – (1) host or network identification and (2) location addressing. ARIN is a nonprofit organization that administers IP addresses. ARIN is a Regional Internet Registry (RIR)[2] and component of the Internet Assigned Numbers Authority (IANA). The IANA delegates Internet resources to RIRs who, in turn, follow regional policies to delegate resources to their customers. Customers include, but are not limited to, internet service providers and end-user organizations who utilize IP addresses in their businesses or enterprises.

Internet "traffic" is routed through IP addresses. The addresses use a series of decimal numbers separated by periods. The IP addresses have gone through several versions, most recently

---

[2] ARIN is one of five RIRs, and is the RIR for the United States, Canada, and many Caribbean and North Atlantic Islands.

versions four (IPv4) and six (IPv6). IPv4 was depleted at a rate not initially anticipated in the original design of the address system, and by 2011 the global IPv4 pool was exhausted. Despite the global exhaustion, ARIN still had its own free pool of IPv4 addresses available. Part of ARIN's responsibilities include allocating IP resources, specifically the allocation, assignment, and transfer of rights to IPv4. ARIN has specific processes and policies that must be followed before rights to an IP address can be assigned or transferred. ARIN's Number Policy Resource Manual (NPRM) sets forth these processes and policies.

Broadly speaking, for an organization to request IP resources and registration rights, it must submit a request to ARIN, provide documentation showing need for the resources in accordance with the NPRM, and enter into a registration services agreement (RSA) with ARIN. Because of the demand for IPv4 addresses, ARIN required justification and customer identification for additional IPv4 address blocks to verify that the request was valid, and ARIN often had a waitlist for IPv4 addresses.

As a result of the demand for IPv4 addresses, a secondary market was created for the transfer of the rights to IP address blocks. The value of the right to an IP address on the secondary market has changed as the demand has increased. At the time Golestan was perpetrating his fraud, the market rate for an IP address right ranged from $9 to $19. The rate has increased significantly since then, and the value of an IP address right fluctuates based on the market as well as the "quality" of the specific address. Brokers are often used to facilitate the sale and transfer of the rights to IP address blocks between businesses. ARIN must approve all transfer requests, and its policies and procedures dictate whether rights to IP address blocks can be sold on the secondary market. For instance, as discussed above, rights to an IP address block cannot be sold on the secondary market if it had been assigned within the last 12 months. *See* ARIN NPRM § 8.3.

B.     **Amir Golestan, Micfo, LLC, and Channel Partners.**

At the time period alleged in the indictment, Micfo, LLC was a business that represented itself as providing hosting services and providing customers with technologies and services needed for a website or webpage to be viewed on the Internet. As part of its business, Micfo applied and registered for IPv4 addresses through ARIN. Golestan started Micfo in 1999, and owned and operated Micfo throughout the existence of the business.

From February 2014 to the time Golestan and Micfo were indicted, Golestan and Micfo created and utilized Channel Partner companies to obtain the rights to IP addresses that they could not legally obtain. The Channel Partner companies purported to be individual businesses, which required IP address rights, and would apply directly to ARIN for the IP address rights. Specifically, the Channel Partners would complete paperwork, which included the identification of officers, and provide justification for the Channel Partner's need for IP address rights. Golestan created fictitious persons, represented to be officers or others acting on behalf of the Channel Partners, for each Channel Partner company. The following Channel Partner companies and individuals, among others, were created and used by Golestan and Micfo:

| Company | Fabricated Individual(s) |
|---|---|
| Contina | John Liberman |
| Virtuzo | Jeff Farber/Mark Schmidt |
| Oppobox | Kevin Chang |
| Telentia | Yong Wook-Kwon |
| Univera Network/HostAware | Steve Cunningham |

4

| Roya Hosting | Brian Sherman |
| --- | --- |
| Host Bang | Ahmad Al Bandi |
| Hyper VPN | Sebatian Buszewski |
| Fiber Galaxy | Pooya Torabi |
| Cloudiac | Pail Lampert |

Part of the scheme was to represent to ARIN, when applying for IP address rights, particular aspects about the Channel Partner company applying. Golestan at times would set forth who the officers were, information regarding the Secretary of State registration, and would submit to ARIN sworn affidavits representing facts about the business, all set forth and often signed by fictitious individuals. Golestan at times would also create web pages and email addresses for these fictitious individuals and Channel Partner companies to make the companies look legitimate and make it look like the individuals did in fact run the companies. Using the Channel Partners, either individually or on applications for Micfo, as justification, Micfo and Golestan were granted the rights to hundreds of thousands of IPv4 addresses from ARIN. Golestan and Micfo then sold the rights to many of these IP addresses to third parties, making a significant profit from their scheme.

  C. **Nature of the charges against Defendants, Defendants' trial, and Defendants' guilty plea.**

In May 2019, Defendants were charged in a twenty-count indictment alleging violations of 18 U.S.C. § 1343 for knowingly devising and intending to devise a scheme and artifice to defraud

and obtain property, specifically IPv4 address rights from ARIN, by means of false and fraudulent pretenses, representations, and promises.[3]

On November 15, 2021, Defendants' trial began in front of this Court. On November 16, 2021, 1.5 days into trial, Defendants pled guilty to all twenty counts of wire fraud pursuant to 18 U.S.C. § 1343. ECF No. 105.

## II.    THE PRESENTENCE REPORT AND OBJECTIONS.

After trial, and in advance of sentencing, the Court ordered briefing from both parties pertaining to the amount of loss attributable to Defendants' criminal acts and the potential victims to Defendants' offenses. ECF Nos. 109 and 113. Each party submitted their respective briefs for the Court's consideration. *See* ECF Nos. 111, 112, 115, and 116. The USPO prepared a PSR for each Defendant in advance of sentencing. The parties each submitted objections, and a revised PSR and addendum were sent to the parties on May 4, 2022 and May 24, 2022, for Golestan and Micfo, respectfully.

The Government's objections pertained primarily to the lack of lack of loss enhancement pursuant to § 2B1.1(b)(1) based on the USPO's determination that there were no victims who suffered an actual loss based on the Sentencing Guidelines' definition of "actual loss" in § 2B1.1.[4] The Government would refer the Court to its previously filed briefs and objections to the PSR for

---

[3] The Government would refer the Court to its Indictment, ECF No. 2, and PSR ¶¶ 1-3 for the details for each of the twenty counts.

[4] The Government also raised in its objections its position that even if there are no victims for the purposes of loss calculation, there are most certainly victims pursuant to the Crime Victims' Rights Act, 18 U.S.C. § 3771 (CVRA) who are entitled to give victim impact statements. Further, based on the Government's position that there are identifiable victims to Defendants' offenses of conviction, the Government believes the Court must order restitution to these victims if there is loss as set forth in 18 U.S.C. § 3663A (MVRA).

its arguments in support of its objections. Further, the Government is prepared to address these objections at Defendants' sentencing.

The Defendant Amir Golestan's objections to the PSR pertain to the obstruction of justice enhancement, which increased the total offense level by two levels. The Government believes the obstruction of justice enhancement was appropriately applied and is prepared to address its position at Defendant's sentencing.

### III.    EVALATION OF THE STANDARDS SET FORTH IN 18 U.S.C. § 3553(a) WARRANTS AN UPWARD VARIANCE TO A SENTENCE ABOVE THE ADVISORY GUIDELINES RANGE.

The sentencing statute, 18 U.S.C. § 3553(a), requires the Court to impose a sentence that is "sufficient, but not greater than necessary," to comply with the purposes of sentencing.[5] In order to determine the "particular" sentence to impose, the Court must consider the familiar statutory factors listed in §3553(a)(1)-(7). Two of the statutory factors that the Court must consider are (1) the advisory guidelines range set by the Sentencing Commission and (2) the Commission's policy statements are factors to be considered. *See* §3553(a)(4) and (a)(5). Further, the Advisory sentencing guidelines "should be the starting point and the initial benchmark" in determining the appropriate sentence. *See Gall v. United States*, 522 U.S. 38 (2007).

There are times when the advisory guideline range does not properly account for a defendant's conduct and a variance, either upwards or downwards, is appropriate after evaluation of each § 3553(a) factor. *United States v. McKinnie*, 21 F.4th 283, 289 (4th Cir. 2021), *cert. denied,* 142 S. Ct. 2798 (2022) (holding that district courts may vary from the guidelines based on

---

[5] Those purposes are the need for the sentence "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." § 3553(a)(2)(A)-(D).

application of § 3553(a) factors). Here, as explained in more detail below, an evaluation of the § 3553(a) factors establishes that the advisory guidelines range does not adequately account for Golestan's criminal conduct, and an upward variance to a more significant sentence is appropriate and is "sufficient, but not greater than necessary" to comply with the purposes of sentencing.

A. Nature of Offense and History and Characteristics of Defendant – §3553(a)(1).

*Nature of the Offense*

Golestan's criminal conduct took skill and effort to allow him to effectuate his scheme to defraud ARIN and make a significant profit off the fraudulently obtained IP addresses. As was presented at trial, Golestan created ten fake Channel Partner companies, which allowed him to get the rights to use IPv4 addresses he would not have otherwise been able to receive. Importantly, as it relates to the complexity and seriousness of the offense, it was not just creation of fake companies—Golestan created fake officers and, at times, created web pages and email addresses for these fictitious individuals and Channel Partner companies to make the companies look legitimate and make it look like the individuals did in fact run the companies. The creation of the fake officers was crucial to Golestan's fraud because ARIN required sworn affidavits from company officers when setting forth justification for the IPv4 addresses.

Golestan knew there was a secondary market for the sale of IPv4 addresses and created a complex and intricate scheme to profit from the sale the IPv4 addresses he obtained the rights to from ARIN. Brokers are often used to facilitate the sale and transfer of IP addresses between businesses, and the Court heard testimony from the following brokers at trial: Jack Hazan, Mike Burns, Hillary Stiff, and IPv4 Market Group. Each broker that testified explained the demand for

IPv4 addresses and the increasing value of an IPv4 address.[6] Moreover, each broker testified that they would not have been involved in the transactions had they known the IPv4 addresses were obtained by fraud.

Golestan's actions have affected more than just ARIN. The fraudulent representations Golestan made, and the use of fake companies and fake persons, impeded other businesses and criminal investigations. Although the full effect will likely never be known, two examples are contained in the victim impact statement submitted by Kerry Culpepper (Culpepper) and by evidence gathered through the FBI's criminal investigation. As it pertains to Culpepper, Golestan's fraudulent representations hindered his client's ability to protect their intellectual property rights because they were unable to identify the owners of the IP addresses that were streaming the intellectual property. As it pertains to other criminal investigations, Scot Sledd (Sledd) is an FBI agent in Nashville, Tennessee. Sledd was involved in an investigation involving national security issues and led federal agents to an IP address associated with Contina – one of Golestan's Channel Partner companies. When federal agents went to speak to Contina, there was no business to be found. Ultimately law enforcement was able to locate Golestan in Charleston, South Carolina, but it took more subpoenas and more investigative resources than would have initially been necessary because of Golestan's fraud.[7]

---

[6] In 2017, the market rate for an IP address ranged from $9 to $13. At the time Defendants' fraud was discovered, IPv4 addresses were selling for between $17 to $19 an address. Currently, market rates for an IPv4 addresses are around $50 an address.

[7] The Government is also aware of an investigation into child pornography that led to an IP address associated with Jordan Liberman and Contina – another fake person and company associated with Golestan's fraud.

9

Through their scheme, Defendants successfully obtained 1,077,130 IPv4 addresses based on either partial or completely fraudulent representations.[8] Moreover, in September 2014, Defendants attempted to acquire an additional 262,142 IPv4 addresses, but this attempted acquisition was flagged by ARIN and never was completed. The total number of IPv4 addresses that Defendants fraudulently obtained or attempted to obtain is approximately 1,339,272. The Government fully briefed the estimated value of these 1,339,272 IPv4 addresses in its memorandum filed with the Court on December 3, 2021 and would refer the Court to this filing for the full analysis. *See* ECF No. 111. However, for the purposes of this sentencing memorandum and potentially instructive for determining what amount of upward variance is appropriate, the Government would set forth that Golestan personally profited $3,375,104.00 from completed sales of IPv4 addresses.[9] This profit alone, if using the loss table of § 2B1.1(b)(1), would result in a 16-level increase to the base offense level and result in a total offense level of 30, resulting in a guidelines range of 97 to 121 months. While the Government understands that loss amount is not always the driving factor in fashioning a "sufficient, but not greater than necessary" sentence, it believes the enhancement that would have been applied but-for the Guidelines definition of "actual loss" is instructive to determining what is an appropriately significant sentence for Golestan.

---

[8] Sweeting testified at trial that IPv4 addresses obtained by Micfo using fictitious Channel Partners were obtained wholly by fraud. Even if legitimate justifications existed apart from the false Channel Partner information, ARIN would not have granted the fictitious Channel Partner rights to the IPv4 addresses.

[9] It is also worth mentioning that at the time Defendants' fraud was discovered by ARIN, he was under contract to sell IPv4 addresses to Saudi Telecom for $19 an address. The value of this stopped contract was $6,225,920.00.

*History and Characteristics of the Defendant*

Although Golestan does not have a significant criminal history, the actions he took to hide his criminal conduct in the present case warrant a significant period of incarceration. The USPO has correctly found that Golestan obstructed justice in the pending criminal proceedings and increased his base offense level by the appropriate two levels. *See* PSR ¶ 57. Even though Golestan is being held accountable for the two-level obstruction enhancement, his actions are also important when evaluating the § 3353(a) factors. As was testified to at trial, Golestan used his employees to effectuate his scheme and in the process negatively impacted their lives, financial stability, and careers. These employees incurred thousands of dollars in legal expenses because of Golestan's frivolous lawsuits against them and are still faced with debt from legal expenses brought about by Golestan's efforts to intimidate them and avoid being caught in his fraud.

Melyssa Banda was hired by Golestan and relocated her family to Charleston, South Carolina and worked tirelessly to try and make Micfo successful. As Banda became more concerned about the legitimacy of the Channel Partner companies and sought answers from Golestan, Golestan became more aggressive towards her, and tensions began to rise. *See* Trial Transcript, Day 2, pg. 258. Banda testified at trial that one day at the office Golestan was "aggressive and shouting profanities at her", and Banda was concerned about her career and reputation if she stayed at Micfo. *See* Trial Transcript, Day 2, pgs. 261, 264. Golestan had a cease-and-desist letter served on Banda at her home after she submitted her resignation. *See* Trial Transcript, Day 2, pg. 264.

Victoria Latham also testified at trial. She testified that Golestan hacked into her Google account to obtain her private text messages and track her location to serve her with a civil lawsuit. *See* Trial Transcript, Day 2, pgs. 360 – 362. In these text messages, Golestan tells his ex-wife that

11

"If I have to get something, especially as it pertains to protecting myself, my family, out company, and our team members, I do everything and become very resourceful." *See id.* pg. 361.

In addition to Golestan's conduct towards his former employees, his actions in a simultaneous family court action also favor a more significant period of incarceration. Golestan threatened the court-appointed Guardian Ad Litem once he learned that she was interviewed by the FBI in the criminal case. It was not just a one-off threat; he threatened her multiple times and one threat involved reporting her to the South Carolina Bar's Office of Disciplinary Counsel. In addition, Golestan was held in criminal contempt by the family court and sentenced to 10 months incarceration for his actions. The exact details that lead to the criminal contempt are unknown to the Government at this time, but a criminal contempt action is not usually instituted for insignificant conduct.

Finally, Golestan's actions in a federal civil lawsuit in Colorado also warrant a significant period of incarceration. The Government would refer the Court to the victim impact statement submitted by Kerry Culpepper for the full details of the lawsuit but the significant portion for the purpose of evaluating this § 3553(a) letter is Golestan's complete disregard for the law and orders from a federal court. In fact, it appears Golestan refused to cooperate with discovery in the Colorado action and willfully disobeyed an order of the Colorado court ordering him to cooperate.

While the Defendant's lack of criminal history may favor a lesser period of incarceration, his actions to hide his fraud, intimate his employees, intimidate persons involved in his family court matter, and also his complete disregard for the law favor a significant upward variance.

> **B.    Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense, Afford Adequate Deterrence to Criminal Conduct, and Need for the Sentence Imposed to Protect the Public from Further Crimes of the Defendant – §3553(a)(2)(A)-(C).**

Economic crimes and white-collar offenses must be met with sentences commensurate with the seriousness of the crimes themselves. Concern that "white-collar offenders . . . frequently do not receive sentences that reflect the seriousness of their offenses" was among the motivations for the Sentencing Reform Act that gave rise to the United States Sentencing Guidelines. S. Rep. No. 98-225 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3260. However, in some instances the advisory guideline range does not adequately account for the seriousness of a person's conduct, and a Court, in its discretion, may vary upward based on an evaluation of each § 3553(a) factor. Here, a sentence less than an upward variance to a significant period of incarceration for Golestan would promote a lack of respect for the law and fail to deter others who may be attempting to profit over fraudulently obtained IPv4 addresses.

Specifically, an upward variance would address the deterrence factor, which is so critical in corruption and fraud cases. Fraud is "'more rational, cool, and calculated than sudden crimes of passion or opportunity,' these crimes are 'prime candidate[s] for general deterrence.'" *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (quoting White–Collar Plea Bargaining and Sentencing After Booker, 47 Wm. & Mary L.Rev. 721, 724 (2005)). "Defendants in white collar crimes often calculate the financial gain and risk of loss, and white-collar crime therefore can be affected and reduced with serious punishment." *Id*. Further, an upward variance to a more significant period of incarceration is imperative to deter others who may be attempted to defraud ARIN, and its counterparts in other parts of the Country, like Golestan did. As mentioned by Mr. Culpepper in his victim impact statement, a significant sentence for Golestan would deter other

data service providers from engaging in similar conduct and send a message to other fraudsters that if they perpetrate fraud against non-profits like ARIN who are attempting to regulate the internet community they will be significantly punished.

### C. The Need to Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct – §3553(a)(6).

Congress has directed sentencing courts to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct . . . ." 18 U.S.C. § 3553(a)(6). "[T]he kind of disparity with which § 3553(a)(6) is concerned is an unjustified difference across judges (or districts) rather than among defendants to a single case." *United States v. Pyles*, 482 F.3d 282, 290 (4th Cir. 2007), *vacated on other grounds* by 552 U.S. 1089 (2008) (internal quotation marks omitted). Thus, the Court is tasked with evaluating sentencing disparities nationwide, rather than between co-defendants. *See id*. "The Guidelines' goal of national sentencing uniformity is not aimed only at the particular criminal conduct that co-conspirators may share, but also addresses other factors that often vary between co-conspirators like acceptance of responsibility and assistance to the government*." United States v. Withers*, 100 F.3d 1142, 1149 (4th Cir. 1996).

Golestan's fraud is complex and unique and took great skill and effort to accomplish. An upward variance to a more significant period of incarceration than that called for by the advisory guidelines range would not create any unwarranted disparity because white collar offenders across the country are receiving sentences commensurate with their conduct and the amount of money involved in their crimes. As discussed briefly earlier in this memorandum, had the PSR found a loss enhancement *solely* on the amount Golestan profited, a 16-level enhancement would have been added to Golestan's total offense level. Simply put, Golestan is getting the benefit of

14

defrauding a non-profit who realized no "actual loss" as defined by the Sentencing Commission and, as a result, he is not being held accountable in the PSR for the amount he personally profited. Further, the actual value of the IPv4 addresses he obtained by fraud and was attempting to sell at the time he was caught is much higher.

### D.     The Need to Provide Restitution – §3553(a)(7).

One of the factors that the Court must consider in fashioning a sentencing is the need to provide restitution for the victims of the offense. Defendant's fraud was complex, and his main victim was a non-profit who incurred significant expense. Defendant's other victims were employees of his company who were harassed and intimated with legal actions and incurred significant legal expenses. These individuals will be unable to be made whole through the restitution statutes and, as a result, an upward variance to a more significant period of incarceration is warranted.

## IV.     CONCLUSION.

For the reasons stated in this memorandum, if the Court overrules the Government's objections to the PSR, the Government believes an evaluation of the § 3553(a) factors warrants a significant upward variance. When each of the sentencing standards set forth in § 3553(a) are examined, it is clear that the advisory guideline range as calculated by the PSR does not promote the purposes of sentencing and adequately punish the Defendant's conduct. Based on the reasoning set forth above, the Government believes an upward variance to a lengthier period of incarceration is sufficient, but not greater than necessary, to comply with the relevant sentencing factors.

Respectfully submitted,

ADAIR F. BOROUGHS
UNITED STATES ATTORNEY


BY: */s/ Amy Bower*
Amy F. Bower (ID#11784)
Assistant United States Attorney
151 Meeting Street, Suite 200
Charleston, SC 29401
843-727-4381
Amy.Bower@usdoj.gov


July 26, 2022
Charleston, South Carolina

16