IN THE DISTRICT COURT OF THE UNITED STATES
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | Crim. No. 2:19-CR-00441-RMG |
| v. | **GOVERNMENT'S SUPPLEMENTAL SENTENCING MEMORANDUM**[1] |
| AMIR GOLESTAN, MICFO, LLC | |

On November 16, 2021, the Defendants Amir Golestan (Golestan) and Micfo, LLC (Micfo) (collectively, Defendants) pled guilty to twenty counts of wire fraud after 1.5 days of trial. The United States submits this memorandum in advance of Defendants' sentencing.[2] In his scheme to defraud, Golestan created fake companies and fake persons to obtain the rights to IP addresses he would not have otherwise been entitled to. Golestan did this because he knew he could make money off the fraudulently obtained IP addresses. In fact, Golestan profited nearly $3.3 million from the sale of fraudulently obtained IP addresses and had a contract for over $6 million in place at the time his fraud was discovered. Not only was Golestan's fraud sophisticated, but throughout his scheme, he harassed and exploited his employees, and others, who threatened exposure of his crimes.

The United States Probation Office (USPO) in its October 2022 Presentence Report (PSR) for Golestan determined the total offense level is 29, which results in a guideline range of 87 to

---

[1] The Government's initial sentencing memorandum was filed on July 26, 2022 and was based on the guidelines calculation set forth in the April 2022 PSR. (ECF No. 143).

[2] This sentencing memorandum's discussion on the 18 U.S.C. § 3553(a) factors pertain primarily to the individual Defendant, Amir Golestan.

108 months. As will be discussed in detail throughout this memorandum, an evaluation of the 18 U.S.C. § 3553(a) factors weigh in favor of a serious punishment for Golestan.

I.     **FACTUAL AND PROCEDURAL BACKGROUND.**

    A.  **Internet Protocol addresses, ARIN policy for assignment or transfer of IP Addresses, and the secondary market for IPv4 addresses.**

An Internet Protocol (IP) address is a numerical label assigned to each device connected to a computer network that uses the IP, or the Internet, for communication. IP addresses serve two basic functions – (1) host or network identification and (2) location addressing. ARIN is a nonprofit organization that administers IP addresses. ARIN is a Regional Internet Registry (RIR)[3] and component of the Internet Assigned Numbers Authority (IANA). The IANA delegates Internet resources to RIRs who, in turn, follow regional policies to delegate resources to their customers. Customers include, but are not limited to, internet service providers and end-user organizations who utilize IP addresses in their businesses or enterprises.

Internet "traffic" is routed through IP addresses. The addresses use a series of decimal numbers separated by periods. The IP addresses have gone through several versions, most recently versions four (IPv4) and six (IPv6). IPv4 was depleted at a rate not initially anticipated in the original design of the address system, and by 2011 the global IPv4 pool was exhausted. Despite the global exhaustion, ARIN still had its own free pool of IPv4 addresses available. Part of ARIN's responsibilities include allocating IP resources, specifically the allocation, assignment, and transfer of rights to IPv4. ARIN has specific processes and policies that must be followed before rights to an IP address can be assigned or transferred. ARIN's Number Policy Resource Manual (NPRM) sets forth these processes and policies.

---

[3] ARIN is one of five RIRs, and is the RIR for the United States, Canada, and many Caribbean and North Atlantic Islands.

Broadly speaking, for an organization to request IP resources and registration rights, it must submit a request to ARIN, provide documentation showing need for the resources in accordance with the NPRM, and enter into a registration services agreement (RSA) with ARIN. Because of the demand for IPv4 addresses, ARIN required justification and customer identification for additional IPv4 address blocks to verify that the request was valid, and ARIN often had a waitlist for IPv4 addresses. There is also a public directory that sets forth who had the rights to IP addresses.

As a result of the demand for IPv4 addresses, a secondary market was created for the transfer of the rights to IP address blocks. The value of the right to an IP address on the secondary market has changed as the demand has increased. At the time Golestan was perpetrating his fraud, the market rate for an IP address right ranged from $9 to $19. The rate has increased significantly since then, and the value of an IP address right fluctuates based on the market as well as the "quality" of the specific address. Brokers are often used to facilitate the sale and transfer of the rights to IP address blocks between businesses. ARIN must approve all transfer requests, and its policies and procedures dictate whether rights to IP address blocks can be sold on the secondary market. For instance, as discussed above, rights to an IP address block cannot be sold on the secondary market if it had been assigned within the last 12 months. *See* ARIN NPRM § 8.3.

  **B.** **Amir Golestan, Micfo, LLC, and Channel Partners.**

During the time period alleged in the indictment, Micfo, LLC was a business that represented itself as providing hosting services and providing customers with technologies and services needed for a website or webpage to be viewed on the Internet. As part of its business, Micfo applied and registered for IPv4 addresses through ARIN. Golestan started Micfo in 1999, and owned and operated Micfo throughout the existence of the business.

From February 2014 to the time Golestan and Micfo were indicted, Golestan and Micfo created and utilized Channel Partner companies to obtain the rights to IP addresses that they could not legally obtain. The Channel Partner companies purported to be individual businesses, which required IP address rights, and would apply directly to ARIN for the IP address rights. Specifically, the Channel Partners would complete paperwork, which included the identification of officers, and provide justification for the Channel Partner's need for IP address rights. Golestan created fictitious persons, represented to be officers or others acting on behalf of the Channel Partners, for each Channel Partner company. The following Channel Partner companies and individuals, among others, were created and used by Golestan and Micfo:

| Company | Fabricated Individual(s) |
|---|---|
| Contina | John Liberman |
| Virtuzo | Jeff Farber/Mark Schmidt |
| Oppobox | Kevin Chang |
| Telentia | Yong Wook-Kwon |
| Univera Network/HostAware | Steve Cunningham |
| Roya Hosting | Brian Sherman |
| Host Bang | Ahmad Al Bandi |
| Hyper VPN | Sebatian Buszewski |
| Fiber Galaxy | Pooya Torabi |
| Cloudiac | Pail Lampert |

Part of the scheme was to represent to ARIN, when applying for IP address rights, particular aspects about the Channel Partner company applying. Golestan at times would set forth who the officers were, information regarding the Secretary of State registration, and would submit to ARIN sworn affidavits representing facts about the business, all set forth and often signed by fictitious individuals. Golestan at times would also create web pages and email addresses for these fictitious individuals and Channel Partner companies to make the companies look legitimate and make it look like the individuals did in fact run the companies. Using the Channel Partners, either individually or on applications for Micfo, as justification, Micfo and Golestan were granted the rights to hundreds of thousands of IPv4 addresses from ARIN. Golestan and Micfo then sold the rights to many of these IP addresses to third parties, making a significant profit from their scheme.

      **C.**      **Nature of the charges against Defendants, Defendants' trial, and Defendants' guilty plea.**

In May 2019, Defendants were charged in a twenty-count indictment alleging violations of 18 U.S.C. § 1343 for knowingly devising and intending to devise a scheme and artifice to defraud and obtain property, specifically IPv4 address rights from ARIN, by means of false and fraudulent pretenses, representations, and promises.[4]

On November 15, 2021, Defendants' trial began in front of this Court. On November 16, 2021, 1.5 days into trial, Defendants pled guilty to all twenty counts of wire fraud pursuant to 18 U.S.C. § 1343. ECF No. 105.

---

[4] The Government would refer the Court to its Indictment, ECF No. 2, and PSR ¶¶ 1-2 for the details for each of the twenty counts.

D.     **April 2022 Presentence Report and Objections.**[5]

After trial, and in advance of sentencing, the Court ordered briefing from both parties pertaining to the amount of loss attributable to Defendants' criminal acts and the potential victims of Defendants' offenses. ECF Nos. 109 and 113. Each party submitted their respective briefs for the Court's consideration. *See* ECF Nos. 111, 112, 115, and 116. The USPO prepared a PSR for each Defendant in advance of sentencing. The parties each submitted objections, and the USPO sent revised PSRs and addendums to the parties on May 4, 2022 and May 24, 2022, for Golestan and Micfo, respectfully.

The Government's objections pertained primarily to the lack of lack of loss enhancement pursuant to § 2B1.1(b)(1) based on the USPO's determination that there were no victims who suffered an actual loss based on the Sentencing Guidelines' definition of "actual loss" in § 2B1.1. The Defendant Amir Golestan's objections to the PSR pertained to the obstruction of justice enhancement, which increased the total offense level by two levels.

E.     **Kerry Culpepper Victim Impact Statement.**

In early July 2022, the Government received a victim impact statement from Kerry Culpepper. Mr. Culpepper is an attorney who represents several producers of motion pictures. In his victim impact statement, Mr. Culpepper set forth damages that his various clients incurred from

---

[5] It is the Government's position that Golestan's objections to the October 2022 are without merit and the Court should sustain the finding of loss as currently set forth in the October 2022 PSR. However, should the Court sustain Golestan's objections and, as such, revert to the April 2022 PSR where there was no finding of loss, the Government would then rely on its July 2022 sentencing memorandum—ECF No. 143—and argue that an upward variance is appropriate. Moreover, the Court put the parties on notice in June 2022 that it was considering an upward variance from the guideline range set forth in the April 2022 PSR. ECF No. 132.

piracy of their works.[6] The works were pirated from IP addresses associated with Micfo and/or Golestan's Channel Partner companies. Mr. Culpepper's initial victim impact statement set forth damages for a group of his clients that were involved in litigation in the District of Colorado with Micfo. Since his victim impact statement was received in July 2022, Mr. Culpepper advised the Government that he also represents additional movie producers who also experienced piracy of their works, and ultimately suffered actual loss, from IP addresses associated with Micfo and/or Golestan's Channel Partner companies. The number of hits from Channel Partner and Micfo IP addresses[7] are set forth in paragraphs 36 through 38 of the October 2022 PSR.

      F.      **October 2022 Presentence Report and Objections.**

After receipt of Kerry Culpepper's victim impact statement on behalf of his clients, this Court directed the USPO to determine whether revisions to the PSR were necessary. In evaluating the information received from Mr. Culpepper, the USPO determined that there were, in fact, victims of Defendants' offenses that suffered actual loss and revised the PSR in October 2022. As outlined in the October 2022 PSR, the total loss suffered by Mr. Culpepper's clients because of Defendants' fraud is $7,795,415.76. *See* PSR ¶¶ 36-39.

Defendants filed a supplemental sentencing memorandum in January 2023 setting forth their objections of the October 2022 PSR. The USPO submitted a revised addendum to the PSR in February 2023 that made no changes to the PSR. The Government agrees with the USPO's

---

[6] Piracy occurs on the internet when content is copied and displayed on the internet without the copyright owner's permission. The streaming of pirated content involves the use of an IP Address.

[7] These are Micfo IP addresses that were either (1) originally registered to a Channel Partner company or (2) used a Channel Partner company as justification for the IP address rights.

responses in the revised addendum but will briefly address the Defendants' objections to the actual loss calculation.[8]

In the Defendants' sentencing memorandum, they state the October 2022 PSR attempts to hold them responsible for uncharged criminal activity and/or activity that was part of the "same course of conduct or common scheme or plan." *See* ECF No. 158 at 18-21. The Government respectfully disagrees with this assertion. The Government interprets the October 2022 PSR to hold Defendants accountable for the actual losses that occurred to Mr. Culpepper's clients *because of* the fraud both Defendants pled guilty to. The number of hits set forth in the October 2022 are directly tied to IP addresses that were (1) either applied for in a Channel Partner name or (2) used a Channel Partner as justification.[9]

For this Court to find Defendants responsible for the actual loss incurred by Mr. Culpepper's clients for guidelines purposes, it must be satisfied, by a preponderance of the evidence, that the pecuniary harm suffered by Mr. Culpepper's clients was reasonably foreseeable to the Defendants.[10] *See* United States Sentencing Commission Guidelines Manual, § 2B1.1, cmt.3(A)(i); § 6A1.3. The evidence makes clear that the Government meets this burden. As

---

[8] The Defendants have also objected to the obstruction of justice enhancement and the lack of adjustment for acceptance of responsibility. The Government believes that the evidence in the record clearly supports the obstruction of justice enhancement and urges the Court to overrule this objection. Moreover, Defendants put the Government to the burden of a trial and chose to enter a plea 1.5 days into trial; as a result, based on the timing of the Defendants' plea, the Government does not believe Defendants should be afforded a reduction for acceptance of responsibility.

[9] Throughout their supplemental sentencing memorandum, Defendants attempt to argue that certain statutory provisions of the Communications Act—47 U.S.C. § 230—prevent them from being held accountable for the actual loss incurred by Mr. Culpepper's clients. A review of the statute makes clear that there are exceptions for enforcement pursuant to other federal criminal statutes. Importantly, however, Defendants are not being charged in a "cause of action" for which they are claiming they are immune. For the purposes of Defendants' sentencing, the question is whether the actual loss suffered by Mr. Culpepper's client can be attributed to the Defendants.

[10] The Government intends to call Mr. Culpepper as a witness at Defendants' sentencing.

established throughout the 1.5 days of trial, Golestan was applying for rights to IP addresses in mass quantity and ultimately resorted to using his fraudulent Channel Partner companies as justification for IP address rights when ARIN was no longer granting Micfo rights.

Much of Micfo's business was servicing Virtual Private Network ("VPN") companies, and to successfully do this, Golestan needed a large quantity of IP addresses. It is also clear that Golestan was undoubtedly aware of the illicit activity many of his Virtual Private Network ("VPN") customers partook in. *See* Wall Street Journal February 2020 Article, pg. 6, attached as **Exhibit A**. In fact, one of Micfo's former clients, "HideMyAss!" is a VPN provider that a simple Google search reveals is known for piracy and its COO was quoted on Micfo's webpage in 2019 as follows:



Golestan was further aware that companies, such as Mr. Culpepper's clients, undertook efforts to monitor and protect their intellectual property. In fact, in his Wall Street Journal interview, he acknowledged that receiving subpoenas was a "routine business" for hosting VPN companies. Based on Golestan's awareness of companies, like Mr. Culpepper's clients, efforts to protect their works, it was also reasonably foreseeable to him that the use of the Channel Partner companies would make these efforts more difficult, which resulted in continued damages to

companies, to include Mr. Culpepper's clients. Indeed, as set forth by Mr. Culpepper in his victim impact statement, Golestan's use of Channel Partner companies hindered his clients from sending notices of infringement to attempt to protect their works.

## II. EVALATION OF THE STANDARDS SET FORTH IN 18 U.S.C. § 3553(a) WARRANTS A SIGNIFICANT PERIOD OF INCARCERATION FOR GOLESTAN.

The sentencing statute, 18 U.S.C. § 3553(a), requires the Court to impose a sentence that is "sufficient, but not greater than necessary," to comply with the purposes of sentencing.[11] In order to determine the "particular" sentence to impose, the Court must consider the familiar statutory factors listed in §3553(a)(1)-(7). Two of the statutory factors that the Court must consider are (1) the advisory guidelines range set by the Sentencing Commission and (2) the Commission's policy statements are factors to be considered. *See* §3553(a)(4) and (a)(5). Further, the Advisory sentencing guidelines "should be the starting point and the initial benchmark" in determining the appropriate sentence. *See Gall v. United States*, 522 U.S. 38 (2007). In the present case, an evaluation of the § 3553(a) factors weighs heavily in favor a significant period of incarceration for Golestan.

### A. Nature of Offense and History and Characteristics of Defendant – §3553(a)(1).

*Nature of the Offense*

Golestan's criminal conduct took skill and effort to allow him to effectuate his scheme to defraud ARIN and make a significant profit off the fraudulently obtained IP addresses. As was presented at trial, Golestan created ten fake Channel Partner companies, which allowed him to get

---

[11] Those purposes are the need for the sentence "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." § 3553(a)(2)(A)-(D).

the rights to use IPv4 addresses he would not have otherwise been able to receive. Importantly, as it relates to the complexity and seriousness of the offense, it was not just creation of fake companies—Golestan created fake officers and, at times, created web pages and email addresses for these fictitious individuals and Channel Partner companies to make the companies look legitimate and make it look like the individuals did in fact run the companies. The creation of the fake officers was crucial to Golestan's fraud because ARIN required sworn affidavits from company officers when setting forth justification for the IPv4 addresses.

Golestan knew there was a secondary market for the sale of IPv4 addresses and created a complex and intricate scheme to profit from the sale the IPv4 addresses he obtained the rights to from ARIN. Brokers are often used to facilitate the sale and transfer of IP addresses between businesses, and the Court heard testimony from the following brokers at trial: Jack Hazan, Mike Burns, Hillary Stiff, and IPv4 Market Group. Each broker that testified explained the demand for IPv4 addresses and the increasing value of an IPv4 address.[12] Moreover, each broker testified that they would not have been involved in the transactions had they known the IPv4 addresses were obtained by fraud.

Golestan's actions have affected more than just ARIN. The fraudulent representations Golestan made, and the use of fake companies and fake persons, impeded other businesses and criminal investigations. Although the full effect will likely never be known, two examples are contained in the victim impact statement submitted by Kerry Culpepper and by evidence gathered through the FBI's criminal investigation. As it pertains to Culpepper, Golestan's fraudulent

---

[12] In 2017, the market rate for an IP address ranged from $9 to $13. At the time Defendants' fraud was discovered, IPv4 addresses were selling for between $17 to $19 an address. Currently, market rates for an IPv4 addresses range between $35 to $50 an address depending on the size.

11

scheme hindered his client's ability to protect their intellectual property rights because they were unable to identify the owners of the IP addresses that were streaming their intellectual property and efforts to send notices of infringement were hindered because of the fake companies.

As it pertains to other criminal investigations, Scot Sledd (Sledd) is an FBI agent in Nashville, Tennessee. Sledd was involved in an investigation involving national security issues and led federal agents to an IP address associated with Contina—one of Golestan's Channel Partner companies. When federal agents went to speak to Contina, there was no business to be found. Ultimately law enforcement was able to locate Golestan in Charleston, South Carolina, but it took more subpoenas and more investigative resources than would have initially been necessary because of Golestan's fraud.[13]

Through their scheme, Defendants successfully obtained 1,077,130 IPv4 addresses based on either partial or completely fraudulent representations.[14] Moreover, in September 2014, Defendants attempted to acquire an additional 262,142 IPv4 addresses, but this attempted acquisition was flagged by ARIN and never was completed. The total number of IPv4 addresses that Defendants fraudulently obtained or attempted to obtain is approximately 1,339,272. The Government fully briefed the estimated value of these 1,339,272 IPv4 addresses in its memorandum filed with the Court on December 3, 2021 and would refer the Court to this filing for the full analysis. *See* ECF No. 111.

---

[13] The Government is also aware of an investigation into child pornography that led to an IP address associated with Jordan Liberman and Contina—another fake person and company associated with Golestan's fraud.

[14] Sweeting testified at trial that IPv4 addresses obtained by Micfo using fictitious Channel Partners were obtained wholly by fraud. Even if legitimate justifications existed apart from the false Channel Partner information, ARIN would not have granted the fictitious Channel Partner rights to the IPv4 addresses.

The Government also believes it is important for this Court to consider what Golestan personally profited when fashioning a sentence. The evidence throughout the trial showed that Golestan profited $3,375,104.00 from completed sales of IPv4 addresses. Further, at the time Defendants' fraud was discovered by ARIN, he was under contract to sell IPv4 addresses to Saudi Telecom for $19 an address. The value of this stopped contract was $6,225,920.00.

As for the actual loss sustained by victims of Golestan's fraud, the October PSR sets forth nearly $7.7 million in damages. While the Government understands that loss amount is not always the driving factor in fashioning a "sufficient, but not greater than necessary" sentence, it believes in this case it weighs in favor of a significant sentence.

*History and Characteristics of the Defendant*

Although Golestan does not have a significant criminal history, the actions he took to hide his criminal conduct in the present case warrant a significant period of incarceration. The USPO has correctly found that Golestan obstructed justice in the pending criminal proceedings and increased his base offense level by the appropriate two levels. *See* PSR ¶ 65. Even though Golestan is being held accountable for the two-level obstruction enhancement, his actions are also important when evaluating the § 3353(a) factors. As was testified to at trial, Golestan used his employees to effectuate his scheme and in the process negatively impacted their lives, financial stability, and careers. These employees incurred thousands of dollars in legal expenses because of Golestan's frivolous lawsuits against them and are still faced with debt from legal expenses brought about by Golestan's efforts to intimidate them and avoid being caught in his fraud.

Melyssa Banda was hired by Golestan and relocated her family to Charleston, South Carolina and worked tirelessly to try and make Micfo successful. As Banda became more concerned about the legitimacy of the Channel Partner companies and sought answers from

13

Golestan, Golestan became more aggressive towards her, and tensions began to rise. *See* Trial Transcript, Day 2, pg. 258. Banda testified at trial that one day at the office Golestan was "aggressive and shouting profanities at her", and Banda was concerned about her career and reputation if she stayed at Micfo. *See* Trial Transcript, Day 2, pgs. 261, 264. Golestan had a cease-and-desist letter served on Banda at her home after she submitted her resignation. *See* Trial Transcript, Day 2, pg. 264.

Victoria Latham also testified at trial. She testified that Golestan hacked into her Google account to obtain her private text messages and track her location to serve her with a civil lawsuit. *See* Trial Transcript, Day 2, pgs. 360 – 362. In these text messages, Golestan tells his ex-wife that "If I have to get something, especially as it pertains to protecting myself, my family, our company, and our team members, I do everything and become very resourceful." *See id.* pg. 361.

In addition to Golestan's conduct towards his former employees, his actions in a simultaneous family court action also favor a more significant period of incarceration. Golestan threatened the court-appointed Guardian Ad Litem once he learned that she was interviewed by the FBI in the criminal case. It was not just a one-off threat; he threatened her multiple times and one threat involved reporting her to the South Carolina Bar's Office of Disciplinary Counsel. In addition, Golestan was held in criminal contempt by the family court and sentenced to 10 months incarceration for his actions.

While the Defendant's lack of criminal history may favor a lesser period of incarceration, his actions to hide his fraud, intimate his employees, intimidate persons involved in his family court matter, and also his complete disregard for the law favor a significant sentence.

    **B.**    **Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense, Afford Adequate Deterrence to Criminal Conduct, and Need for the Sentence Imposed to Protect the Public from Further Crimes of the Defendant – § 3553(a)(2)(A)-(C).**

Economic crimes and white-collar offenses must be met with sentences commensurate with the seriousness of the crimes themselves. Concern that "white-collar offenders . . . frequently do not receive sentences that reflect the seriousness of their offenses" was among the motivations for the Sentencing Reform Act that gave rise to the United States Sentencing Guidelines. S. Rep. No. 98-225 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3260.

In the present case, a significant period of incarceration would address the deterrence factor, which is so critical in corruption and fraud cases. Fraud is "'more rational, cool, and calculated than sudden crimes of passion or opportunity,' these crimes are 'prime candidate[s] for general deterrence.'" *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (quoting White–Collar Plea Bargaining and Sentencing After Booker, 47 Wm. & Mary L.Rev. 721, 724 (2005)). "Defendants in white collar crimes often calculate the financial gain and risk of loss, and white-collar crime therefore can be affected and reduced with serious punishment." *Id*. Further, significant period of incarceration is imperative to deter others who may be attempted to defraud ARIN, and its counterparts in other parts of the Country, like Golestan did. As mentioned by Mr. Culpepper in his victim impact statement, a significant sentence for Golestan would deter other data service providers from engaging in similar conduct and send a message to other fraudsters that if they perpetrate fraud against non-profits like ARIN who are attempting to regulate the internet community they will be significantly punished.

  **C.**  **The Need to Provide Restitution – §3553(a)(7).**

One of the factors that the Court must consider in fashioning a sentencing is the need to provide restitution for the victims of the offense. As set forth in the October 2022 PSR, pursuant to 18 U.S.C. § 3663A, restitution for the actual loss sustained by Kerry Culpepper's clients is $7,795,415.76. As set forth throughout this memorandum, Golestan's fraud was complex, and one of his victims, ARIN, is a non-profit who incurred significant expense during the investigation, prosecution, and ultimate attendance at proceedings related to Golestan's offenses. In ARIN's victim impact statement, it has set forth that it incurred $76,978.25 in costs and expenses and, as such, the Government would request that this Court order restitution be paid to ARIN as part of Golestan's sentence.

Golestan's other victims were employees of his company who were harassed and intimated with legal actions and incurred significant legal expenses. These individuals will be unable to be made whole through the restitution statutes and, as a result, the Government believes a significant period of incarceration is warranted.

**III.** **CONCLUSION.**

For the reasons stated in this memorandum, the Government believes an evaluation of the § 3553(a) factors warrants a significant period of incarceration for Golestan. When each of the sentencing factors set forth in § 3553(a) are examined, it is clear that a significant sentence will promote the purposes of sentencing and adequately punish the Defendant's conduct.

[SIGNATURE BLOCK ON FOLLOWING PAGE]

Respectfully submitted,

ADAIR F. BOROUGHS
UNITED STATES ATTORNEY


BY: *s/ Amy Bower*
Amy F. Bower (ID#11784)
Assistant United States Attorney
151 Meeting Street, Suite 200
Charleston, SC 29401
843-727-4381
Amy.Bower@usdoj.gov


September 5, 2023
Charleston, South Carolina